UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FERRIS BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:10 CV 1053 DDN |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the applications of plaintiff Ferris Brown for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423.[1]  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 8.) For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

**I.   BACKGROUND**

Plaintiff, who was born on November 30, 1961, filed an application on January 17, 2008, alleging disability beginning on October 22, 2007, on account of congestive heart failure and shortness of breath.  (Tr. 131-37, 143-48.)  He received a notice of disapproved claims on March 7, 2008.  (Tr. 92-100.)  After a hearing on July 1, 2009, the ALJ denied benefits on July 22, 2009.  (Tr. 1-40, 52-62.)  On April 23, 2010, the Appeals Council denied his request for review.  (Tr. 41-45.)  Thus, the ALJ's decision stands as the final decision of the Commissioner.

---

[1]Plaintiff also challenges defendant's decision denying him Supplemental Security Income under Title XVI of the Act.  (Docs. 1, 17.) However, the administrative record contains no record of an application for Title XVI benefits, nor did the ALJ address disability under Title XVI.   Therefore, the court addresses only plaintiff's application for Title II benefits.

## II.  MEDICAL HISTORY

On November 9, 2007, plaintiff was admitted to Christian Hospital due to shortness of breath.  Tests indicated an ejection fraction of either 25% or 35%,[2] marked left atrial enlargement, and a hypertrophied and hypokinetic left ventricle.  He responded well to treatment and was discharged four days later with diagnoses of ischemic cardiomyopathy, tobacco addiction, congestive heart failure, and elevated troponins[3] probably due to congestion. (Tr. 196-99, 213-15.)

On November 15, 2007, plaintiff followed-up with Antonio Penilla, M.D., for a cardiac catheterization.  Final diagnoses were (1) mild-to-moderate pulmonary hypertension, (2) severe left ventricular dysfunction, (3) intravascular fluid volume depletion, (4) dilated cardiomyopathy, and (5) normal coronary circulation.  Dr. Penilla recommended adjusting plaintiff's medications and repeating the echocardiogram in three to six months.  (Tr. 219-20, 237-38, 320-21.)

On December 31, 2007, plaintiff followed-up with Dr. Penilla.  Later that day, Dr. Penilla sent Rebecca Rugen, M.D., a treatment note stating that plaintiff was diagnosed with dilated nonischemic cardiomyopathy.  Dr. Penilla noted that plaintiff had no obstructive coronary disease, and had improved with medical therapy.  Dr. Penilla also noted that plaintiff was asymptomatic and had no chest pain, no dyspnea, and no edema or other symptoms of congestive heart failure.  (Tr. 239.)

In a form dated January 7, 2008, Dr. Penilla evaluated plaintiff's ability to return to work.  Dr. Penilla opined that plaintiff could not perform all of the essential functions of his job, regardless of accommodations.  Dr. Penilla noted that plaintiff should not return to work based on his job description because his heart was too weak.  (Tr. 229.)

---

[2]Ejection fraction is a measurement of the percentage of blood leaving the heart upon contraction.  A normal left ventricle ejection fraction is 55 to 70%.  Mayo Clinic, http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited September 27, 2011).

[3]Troponins are central regulatory proteins of muscle contraction.  Stedman's Medical Dictionary 2037 (28th ed. 2006).

On February 22, 2008, Dr. Penilla completed a Medical Substantiation Requirement form regarding plaintiff's employment.  Dr. Penilla noted that plaintiff had been diagnosed with dilated cardiomyopathy, and that he did not expect plaintiff to return to his previous work.  Dr. Penilla opined that at most each day, plaintiff could stand for four hours, sit up for eight hours, kneel/squat for two hours, bend/stoop for two hours, and twist for two hours, but could not push/pull at all.  Dr. Penilla also opined that at most each day, plaintiff could walk for two hours, climb for two hours, grasp/squeeze for four hours, flex/extend for four hours, reach for two hours, type for eight hours, and lift up to ten pounds for four hours.  Dr. Penilla noted that plaintiff's impairment was permanent and he was not to work.  (Tr. 227.)

On March 7, 2008, Donald Pfleger, a medical consultant with the Social Security Administration, completed a Physical Residual Functional Capacity Assessment form.  Mr. Pfleger opined that plaintiff could lift and/or carry 10 pounds occasionally or frequently; stand and/or walk for two hours out of eight; and sit for six hours out of eight.  Mr. Pfleger also opined that plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl, and had no push/pull, manipulative, visual, or communicative limitations.  (Tr. 240-45.)

On April 21, 2008, Dr. Penilla wrote a letter stating that plaintiff has severe nonischemic dilated cardiomyopathy and, as a result, was advised that he may not safely return to his previous work.  (Tr. 246.)

On April 29, 2008, plaintiff was seen by Dr. Rugen for bloating, constipation, and insomnia.  Assessments were (1) second cardiomyopathy, not otherwise specified, with bloating most likely caused by congestive heart failure; (2) constipation, not otherwise specified; and (3) insomnia.  (Tr. 292-93.)

On May 15, 2008, plaintiff was tested in the Sleep Disorder Center at Northwest Healthcare.  He was diagnosed with (1) disordered maintenance of sleep, (2) mild sleep apnea, (3) severe hypoxemia, and (4) impaired sleep efficiency.  He was tested again two weeks later and was diagnosed with obstructive sleep apnea, responsive to therapy with continuous positive airway pressure (CPAP), and advised to use a face mask with warm air humidity.  (Tr. 286-88.)

- 3 -

On June 10, 2008, Rosalyn Beaty, M.D., wrote plaintiff a letter confirming that plaintiff's physician had restricted plaintiff's activities to standing for no more than four hours; kneeling, squatting, bending stooping, walking, and climbing for no more than two hours; and pushing, pulling, and lifting no more than 10 pounds over four hours per day. Plaintiff's physician opined that plaintiff's limitations were unlikely to change in the near future. Plaintiff was directed to contact his supervisor at American Airlines to determine how to best accommodate his work restrictions. (Tr. 173.)

On June 20, 2008, plaintiff followed-up with Dr. Penilla. That day, Dr. Penilla wrote Dr. Rugen that plaintiff still had dilated nonischemic cardiomyopathy and was New York Heart Association (NYHA) functional Class II. Dr. Penilla noted that plaintiff had been doing well since his last visit and had no dyspnea and no edema or other signs of congestive heart failure, and that plaintiff was not taking his medication as-directed. Dr. Penilla counseled plaintiff on the importance of compliance with his medications. (Tr. 298.)

On July 22, 2008, plaintiff saw Dr. Rugen for abdominal discomfort, bloating, constipation, fatigue, and congestive heart failure. Assessments were constipation and second cardiomyopathy. (Tr. 289-90.)

Also that day, plaintiff had his chest examined by a radiologist at Northwest Healthcare. A slight increase was found in the right side of pleural effusion. Plaintiff was diagnosed with second cardiomyopathy, not otherwise specified, and congestive heart failure. (Tr. 284, 299.)

On August 1, 2008, plaintiff saw Dr. Penilla for shortness of breath, increased abdominal girth, and upper abdominal pain. Plaintiff was admitted to Christian Hospital for modest decompensation of his heart failure and for an evaluation of his abdominal pain. An echocardiogram revealed moderate left ventricular chamber enlargement with severe hypokinesis. Dr. Penilla noted that plaintiff's follow-up had not been ideal because he had difficulty with taking medications, partly due to noncompliance. Plaintiff's abdominal and breathing problems were resolved, and he was able to walk around the ward without difficulty. Plaintiff was discharged two days later with diagnoses of (1) acute systolic heart failure superimposed on chronic heart failure,

- 4 -

(2) nonischemic dilated cardiomyopathy with severe left ventricular systolic function, (3) small right pleural effusion, and (4) epigastric and upper quadrant abdominal discomfort likely reflective of passive hepatic congestion.  (Tr. 247-52, 294.)

On August 3, 2008, Larry Berarducci, M.D., wrote Dr. Rugen that plaintiff had been admitted to the hospital two days earlier with mild decompensation of his heart failure, some shortness of breath, and some upper-abdomen discomfort.  Dr. Berarducci advised that plaintiff began feeling better the next day, and was walking without difficulty upon discharge.  (Tr. 297.)

On September 11, 2008, plaintiff was seen by Barbara Ellzey, M.D., at Christian Hospital for abdominal pain.  Plaintiff reported that the pain had begun two days earlier, and was causing him nausea and shortness of breath.  Plaintiff was diagnosed with acute gastritis, or irritation of the stomach lining, and was directed to use antacids as-needed.  (Tr. 253, 265.)

On September 19, 2008, plaintiff followed-up with Dr. Penilla.  Dr. Penilla wrote Dr. Rugen that plaintiff had done well since his discharge, was free of chest pain and dyspnea, was active, and was functionally Class II at the time.  (Tr. 296.)

On December 2, 2008, an examination by Chandrakant Tailor, M.D., revealed hypokinesia and a left ventricular ejection fraction of 35%.  (Tr. 282, 329.)

On December 23, 2008, plaintiff followed-up with Dr. Penilla.  In a letter, Dr. Penilla advised Dr. Rugen that plaintiff had done well from a cardiac standpoint since his last visit in November 2007.  Plaintiff still had stable NYHA Class III symptoms but had no recent episodes of decompensated heart failure, no complaints of dyspnea at his level of physical activity, and no episodes of orthopnea or paroxysmal nocturnal dyspnea.  Plaintiff reported he was able to take his medications without any side effects.  A MUGA scan had been done at Christian Hospital on December 2, 2008 that indicated his ejection fraction of 39%.  Plaintiff asked Dr. Penilla to complete an application to receive a disabled individual motor vehicle plate, and that Dr. Penilla believed plaintiff would qualify because he had Class III heart failure.  Plaintiff was

advised to follow a healthy diet and to exercise as much as he could tolerate. (Tr. 295, 314, 338.)

On January 19, 2009, plaintiff saw Dr. Penilla for hemoptysis. Dr. Penilla advised Dr. Rugen that plaintiff had a coughing spell with hemoptysis only once a few weeks earlier. Plaintiff had no chest pain, and no increased dyspnea, edema or weight gain. Dr. Penilla diagnosed plaintiff with probable acute decompensated congestive heart failure manifested by coughing and hemoptysis, and dilated nonischemic cardiomyopathy. (Tr. 316, 337.) A chest X-ray conducted that day revealed a massive cardiomegaly, increased opacification of the lung fields, and a small right pleural effusion. (Tr. 317, 330.)

On February 23, 2009, Dr. Penilla completed Cardiac Residual Functional Capacity Questionnaire form. Dr. Penilla diagnosed plaintiff with dilated nonischemic cardiomyopathy, functional Class II-III, and a guarded prognosis. Clinical tests, including a cardiac catheterization, echocardiograms, and MUGA scan, pointed to severely impaired left ventricular systolic function. Symptoms included shortness of breath, fatigue, weakness, edema, palpitations, and dizziness. (Tr. 301, 309.)

Dr. Penilla opined that plaintiff was capable of tolerating low stress jobs, although his cardiac symptoms would frequently interfere with his attention and concentration during a typical workday. Dr. Penilla further opined that plaintiff could sit for about four out of eight hours; would need a job that permits shifting positions at will from sitting, standing or walking; and would need to take unscheduled breaks by sitting quietly two to four times for 15-30 minutes at a time during an eight hour working day. Dr. Penilla also opined that plaintiff could frequently lift less than ten pounds, rarely ten pounds, and never lift 20 or 50 pounds; rarely climb ladders and stairs; and occasionally twist, stoop, bend, crouch, or squat. Plaintiff was to avoid all exposure to extreme cold or heat, high humidity, wetness, fumes, dust, and chemicals. Dr. Penilla opined that plaintiff was likely to be absent from work more than four days per month. (Tr. 302-05, 310-13.)

Dr. Penilla also completed a NYHA Classification of Patients with Diseases of the Heart form, in which Dr. Penilla indicated that plaintiff was NYHA Class III. This meant plaintiff had cardiac disease resulting

- 6 -

in marked limitation of physical activity, was comfortable at rest, and had fatigue, palpitation, dyspnea, or anginal pain, all from less than ordinary activity.  (Tr. 306, 308.)

On March 2, 2009, plaintiff followed-up with Dr. Penilla regarding his congestive heart failure.  That day, Dr. Penilla wrote Dr. Rugen that according to a MUGA scan, plaintiff's ejection fraction had improved from 25% to 40%, although the most recent echocardiogram in February 2009 had shown 35%.  Plaintiff was diagnosed with idiopathic dilated nonischemic cardiomyopathy, with last ejection fraction of 40%, and congestive heart failure, compensated, functional Class II.  (Tr. 323, 336.)

On March 17, 2009, plaintiff filled out a Chest Pain Questionnaire form.  Plaintiff wrote that he has extreme shortness of breath and fatigue, but no actual chest pain.  He also wrote that he cannot lift 10 pounds or a gallon of milk; has to rest after walking 20-30 feet or climbing stairs; usually takes two naps each day; and that his shortness of breath and fatigue have gotten progressively worse.  (Tr. 180-82.)

That day, plaintiff also completed a Function Report — Adult form. Plaintiff reported that each day, he wakes up between noon and 1:00 p.m., eats breakfast made by his fiancé, takes his medications, takes a shower, lays down for 2-4 hours, watches TV, visits with his family, plays on the computer, eats lunch, naps, eats dinner, and goes to bed.  His heart condition causes him fatigue and limits his ability to dress and bathe himself.  His fiancé prepares his meals, and he does not do any chores. He cannot lift a gallon of milk, and has difficulty squatting, bending, kneeling, and climbing stairs.  He can only walk 20-30 feet at a time and can only pay attention for 30 minutes to an hour.  He only goes to the bank or post office with others, and always stays in the car.  He waits in the car or sits in the front of the store when his fiancé goes grocery shopping.  He goes to church but gets tired from sitting for two hours. (Tr. 183-91.)

On April 27, 2009, Dr. Penilla opined that plaintiff had exertional dyspnea and cardiac chest pain.  Dr. Penilla noted that plaintiff had documented dilated cardiomyopathy with severely impaired left ventricular systolic function, an ejection fraction of 25% or less, and that there was no need an for EKG, stress test, or chest X-ray.  (Tr. 319.)

- 7 -

On May 1, 2009, M. Perll, a Social Security Administration regional medical consultant, performed an advisory review of new evidence from Dr. Penilla.  The evidence was a medical source statement indicating that plaintiff had exertional dyspnea and chest pain of cardiac origin, a catheterization report showing an ejection fraction of 25% and normal coronary circulation, and a NYHA classification form indicating NYHA Class III.  Plaintiff had also submitted updated daily activity questionnaires, dated March 17, 2009, in which he reported extreme shortness of breath and fatigue, but no actual chest pain.  Plaintiff also reported needing to rest after walking 20-30 feet and taking almost 10 minutes to climb one flight of stairs.  Perll noted that this activity level was consistent with NYHA Class III, and concluded that although plaintiff's allegations were consistent with the medical evidence, there was no evidence supporting a NYHA Class IV, which would be required to establish a more-limited residual function capacity.  (Tr. 324-28.)

In an undated Missouri Supplemental Questionnaire form, plaintiff stated that he is unable to work because his heart condition causes him shortness of breath, particularly when moving, climbing stairs, and walking.  Plaintiff also stated that he can pay bills, count change, iron, do his own banking, and go to the post office, but he cannot do the dishes, laundry, vacuum, or care for his lawn.  His girlfriend does the shopping and prepares his meals.  In an average day, he reads the paper, watches TV, reads, or uses the computer.  He is able to drive himself to his doctor, the store, and church.  He has no difficulty following instructions or getting along with others.  (Tr. 155-62.)

**Medical Records Submitted Directly to Appeals Council**

On October 9, 2009, Erica Uppstrom, M.D., performed an echocardiogram at the direction of Dr. Penilla.  Conclusions from the test were (1) moderate enlargement of left ventricle cavity, (2) severe global left ventricular systolic dysfunction, ejection fraction 33%, (3) that a left ventricular apical mass was a false tendon, not a thrombus, (4) mild enlargement of right ventricle and severe right ventricular hypokinesis, (5) biatrial enlargement, (6) moderate to severe mitral

- 8 -

valve regurgitation, (7) moderate pulmonary hypertension, and (8) severe tricuspid regurgitation. (Tr. 342-43.)

On March 8, 2010, Dr. Penilla wrote Dr. Rugen regarding a follow-up visit with plaintiff from earlier in the day. Dr. Penilla noted that plaintiff had nonischemic cardiomyopathy with an original ejection fraction of 25%, and that although his ejection fraction improved after treatment to 40%, the last measure in October 2009 was 33%. Dr. Penilla also wrote that plaintiff had moderate to severe mitral regurgitation and severe tricuspid regurgitation with mild to moderate pulmonary hypertension. Plaintiff was seen by Dr. Penilla in January 2010 because of progressive abdominal bloating. Plaintiff had been tired and with very low exercise tolerance. His diuretics had been temporarily increased but without much improvement. He continued to have bloating with progressive weight gain, gaining another 9 pounds in the last four weeks. There was no paroxysmal nocturnal dyspnea and no orthopnea or edema, although his abdominal girth was increasing. Dr. Penilla's impressions were: (1) progressive left ventricular systolic failure with significant component of right ventricular failure, (2) dilated nonischemic cardiomyopathy with normal coronary circulation, with the last ejection fraction being 33%, (3) hypotension, (4) dyslipidemia, (5) moderate to severe mitral regurgitation and tricuspid regurgitation, and (6) mild pulmonary hypertension. Dr. Penilla opined that plaintiff had progressive myocardial failure, but that he could not increase his medication because plaintiff already had low blood pressure. Dr. Penilla noted that he had discussed use of an implantable cardioverter defibrillator (ICD) with plaintiff because of plaintiff's low ejection fraction and dilated cardiomyopathy. (Tr. 340-41.)

On August 23, 2010, Dr. Penilla completed a NYHA Classification of Patients with Diseases of the Heart form, in which he opined that plaintiff was NYHA Class IV. This meant plaintiff had cardiac disease resulting in an inability to carry on any physical activity without discomfort, had cardiac insufficiency or anginal syndrome even at rest, and had discomfort from any physical activity. (Tr. 346.)

**Testimony at the Hearing**

The ALJ conducted a hearing on July 1, 2009. Plaintiff testified to the following. He is separated from his wife and lives in a house with his girlfriend and her 36-year-old daughter, both of whom receive disability benefits. He completed the ninth grade. (Tr. 6-9.)

Most recently, in October, 2007, plaintiff worked as a baggage handler at an airport in Miami. He did no paperwork. (Tr. 9-10.) Before that, he worked in construction in New York for 15 years, where he swept and shoveled hot asphalt on highway roads. (Tr. 15-16.)

He is not able to read well. For example, he can read the price on tags at a grocery store and some road signs, but he cannot read the Bible or letters. When he worked at the Miami airport, he could read luggage tags but not airport signs. He cannot do simple arithmetic well, such as making simple change at a grocery store. He cannot write notes or letters, and his girlfriend and her daughter filled out the application for disability for him. Plaintiff testified that part of the application was not accurately filled out. While the application says that he can pay bills, complete a money order, and count change, for example, he cannot do any of them. (Tr. 10-15.)

He can only walk, eat, and use the bathroom. He usually lays down and watches TV. He does not play computer games, despite his application indicating that he does. He can only walk 30 feet or stand 10-15 minutes before resting, but can sit all day. He can lift up to 5-10 pounds, and has difficulty climbing stairs in the house. He does not iron his clothes, go to the post office, do his banking, or read the paper, although his signed application states that he does. (Tr. 19-25.)

He is not able to work due to his heart condition, which began in October, 2007. (Tr. 17.) His condition has worsened since he filed for disability benefits, though he is unsure whether he feels better now because his medication puts him "in a zone." (Tr. 26-28.)

He is able to drive, and he drove himself to the doctor's office. He also can cook and hand wash his dishes, but he does not do his laundry, and a neighbor does his yard work. He can only buy a few things from the grocery store by himself, but can go with others to the grocery store to buy more items. (Tr. 28-31.) During the examination by his

- 10 -

attorney, he testified that he has no energy and that he has some difficulty putting on his shoes and washing his body.  He takes naps during the day because of his medication, and lays down at least four times each day.  (Tr. 33.)

Vocational Expert (VE) Delores Gonzalez also testified at the hearing.  The ALJ posed two hypothetical questions to the VE.  In the first hypothetical, the ALJ had the VE assume the individual could lift and carry 10 pounds occasionally and 10 pounds frequently; stand and walk two hours out of eight; sit six hours out of eight; climb stairs and ramps occasionally; never climb ropes, ladders, or scaffolds; stoop, kneel, and crouch occasionally; and never crawl.  This individual would also have to avoid concentrated exposure to extreme cold and extreme heat.  The VE testified that this hypothetical individual could not perform plaintiff's previous work, but could perform other work as a stuffer or as a table worker.  (Tr. 35-36.)

In the second hypothetical, the ALJ added that the individual would need up to two naps daily, in addition to the normal two breaks and lunch hour.  The VE testified that these limitations would preclude competitive employment.  (Tr. 36.)

During the examination by plaintiff's attorney, the VE testified that a NYHA Class III condition would permit sedentary employment, but that a Class IV condition would preclude all employment.  The attorney had the VE assume that the individual's attention and concentration were frequently interfered with, that the individual could walk less than one block without rest or severe pain, and that the individual could sit about four hours a day.  This individual would also need a job that allows shifting at will from sitting, standing, or walking, and need to take two to four unscheduled breaks during an eight-hour workday for 15-30 minutes at a time.  The VE testified that these limitations would preclude competitive employment.  The VE also testified that missing more than four days of work per month because of symptoms would be incompatible with work.  (Tr. 38-39.)

### III.  DECISION OF THE ALJ

On July 22, 2009, the ALJ issued a decision denying plaintiff's claim. (Tr. 52-62.)  At Step One, the ALJ found that plaintiff met the insured requirements of the Act and had not engaged in substantial gainful activity since October 22, 2007, his alleged onset date.  At Step Two, the ALJ found that plaintiff had severe impairments of dilated nonischemic cardiomyopathy and obstructive sleep apnea.  At Step Three, the ALJ found that plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 57.)

The ALJ then determined that plaintiff had the residual functional capacity (RFC) to perform "sedentary work" as defined in 20 C.F.R. § 404.1567(a), except that he could only occasionally climb stairs and ramps; the he could never crawl or climb ropes, scaffolds, or ladders; that he could only occasionally stoop, kneel, or crouch; and that he always had to avoid exposure to cold and heat.  (Tr. 59-61.)

At Step Four, the ALJ found that plaintiff was unable to perform any of his past relevant work.  At Step Five, the ALJ found that given plaintiff's age, education, work experience, and RFC, he could perform jobs existing in significant numbers in the national economy, such as a sticker, stuffer, and table worker.  Accordingly, the ALJ concluded that plaintiff was not "disabled" within the meaning of the Act.  (Tr. 61-62.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the applicable legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary

outcome or because the court would have decided the case differently. See Kroqmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant prevails on Steps One and Two, the case continues. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant has the RFC to perform other work. Id.

In this case, the ALJ determined that plaintiff could not perform his past work, but that he has the RFC to perform other work.

## V. DISCUSSION

Plaintiff argues that the ALJ erred when determining his RFC by adopting the less-restrictive opinion of his treating specialist, Dr. Penilla, and in failing to recontact Dr. Penilla for additional information. Plaintiff also argues that the ALJ's RFC determination was not supported by at least some medical evidence. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Plaintiff further argues that the ALJ improperly considered

- 13 -

his demeanor at the hearing, the ALJ erred in relying on the VE's testimony, and that medical records submitted directly to the Appeals Council contradict the ALJ's RFC determination.

## A.  Opinion of Dr. Penilla

When a treating physician's medical notes conflict with a residual functional capacity assessment prepared by the physician, the ALJ may lawfully give no weight to the residual functional capacity assessment. Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007) ("When a treating physician's notes are inconsistent with his or her residual functional capacity assessment, we decline to give controlling weight to the residual functional capacity assessment.").

Substantial evidence supports the ALJ's decision to adopt Dr. Penilla's February 22, 2008 report instead of Dr. Penilla's February 23, 2009 report.  The ALJ reasoned that Dr. Penilla's February 23, 2009 report was inconsistent with Dr. Penilla's own medical notes and plaintiff's daily activities.  In his reports, Dr. Penilla consistently noted that plaintiff was "doing well," had no dyspnea and no edema, was able to walk without difficulty, was NYHA Class II or III, and had an improved ejection fraction of 35-40%. (Tr. 245,52, 294-98, 301, 306-09, 330, 314-17, 323, 336-38). Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (stating that a treating physician's inconsistent records and opinions undermine the weight that should be afforded to his opinions). The ALJ also found Dr. Penilla's 2009 report inconsistent with plaintiff's daily activities of household chores, shopping, and going to church.  Based on the record, substantial evidence supported the ALJ's decision to adopt Dr. Penilla's February 22, 2008 report over his February 23, 2009 report. See generally Boettcher v. Astrue, ___ F.3d ____, 2011 WL 3802780, at *2 (8th Cir. Aug. 30, 2011) (noting that the court should "not reverse simply because some evidence supports a conclusion other than that reached by the ALJ"); Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (stating that the court must affirm even if "it is possible to draw two inconsistent positions from the evidence" so long as one of those positions represents the ALJ's findings).

Plaintiff also argues that, because the ALJ was faced with inconsistent opinions from the same physician, the ALJ should have recontacted Dr. Penilla for additional information.  The ALJ's duty to develop the record fully and fairly includes a duty to recontact a treating physician for clarification when "a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); see also 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.")  The ALJ did not find Dr. Penilla's opinions unclear, inadequate, or ambiguous; the ALJ found that Dr. Penilla's treatment notes and plaintiff's daily activities supported Dr. Penilla's February 22, 2008 report rather than Dr. Penilla's February 23, 2009 report. Because Dr. Penilla's reports were not unclear or deficient, the ALJ was permitted to give Dr. Penilla's February 22, 2008 report controlling weight without recontacting Dr. Penilla for additional information or clarification.

**B.  RFC Determination**

Plaintiff argues that the ALJ's RFC determination is not supported by at least some medical evidence.  See Lauer, 245 F.3d at 704; Singh, 222 F.3d at 451.  The ALJ found that plaintiff retained the RFC to perform "sedentary work," as defined in 20 C.F.R. § 404.1567(a), except that plaintiff can only occasionally climb stairs and ramps; never crawl or climb ropes, scaffolds, or ladders; only occasionally stoop, kneel, or crouch; and always avoid concentrated exposure to cold and heat.

In his February 22, 2008 report, Dr. Penilla opined that plaintiff could stand for four hours, sit up for eight hours, kneel/squat for two hours, bend/stoop for two hours, and twist for two hours, but could not push/pull at all.  Dr. Penilla also opined that plaintiff could walk for two hours, climb for two hours, grasp/squeeze for four hours, flex/extend for four hours; reach for two hours, type for eight hours, and lift up to ten pounds for four hours.  (Tr. 227.)  Dr. Penilla also regularly

- 15 -

noted that plaintiff was "doing well" and that his ejection fraction was improving. (Tr. 245,52, 294-98, 314-15, 323, 336-38). Therefore, the ALJ's RFC determination was based on at least some medical evidence. See Lacroix v. Barnhart, 465 F.3d 881, 888-89 (8th Cir. 2006) ("While there is evidence in the record that [the claimant's] hearing loss is more severe than described in the ALJ's RFC determination, there is also evidence in the record that supports the ALJ's determination.").

## C.  Plaintiff's Demeanor During the Hearing

Plaintiff argues that the ALJ improperly employed the "sit and squirm test," whereby the ALJ adversely considered plaintiff's demeanor during the hearing when evaluating plaintiff's credibility. When analyzing a claimant's credibility, the ALJ may not rely solely on whether the claimant "sits and squirms" during the hearing. Muncy v. Apfel, 247 F.3d 728, 736 (8th Cir. 2001).

Here, the ALJ found that plaintiff's description of his limitations was inconsistent with what he disclosed to his doctors, and that this "it was obvious [observing plaintiff testify] that he was not being completely candid." (Tr. 60.) "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001). Therefore, the ALJ was permitted to consider plaintiff's demeanor when testifying as a factor when determining whether plaintiff was being truthful.

## D.  Hypothetical Question to the Vocational Expert

Plaintiff argues that the ALJ's hypothetical question to the VE did not accurately reflect the limitations in Dr. Penilla's February 22, 2008 report. "A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." Boettcher, 2011 WL 3802780, at *7.

In his first hypothetical, the ALJ had the VE assume the individual could lift and carry 10 pounds occasionally and 10 pounds frequently; stand and walk two hours out of eight; sit six hours out of eight; climb stairs and ramps occasionally; never climb ropes, ladders, or scaffolds;

stoop, kneel, and crouch occasionally; never crawl; and always had to avoid concentrated exposure to extreme cold and extreme heat.  In his February 22, 2008 report, Dr. Penilla opined that plaintiff could stand for four hours; sit up for eight hours; kneel/squat for two hours; bend/stoop for two hours; twist for two hours; not push/pull at all; walk for two hours; climb for two hours; grasp/squeeze for four hours; flex/extend for four hours; reach for two hours; type for eight hours; and lift up to ten pounds for four hours.  To the extent the ALJ's RFC determination differs from the limitations set forth in Dr. Penilla's February 23, 2008 report, Dr. Penilla's other treatment notes, which indicated that plaintiff was "doing well" and had an improved ejection fraction, support the ALJ's RFC determination. (Tr. 245,52, 294-98, 314-15, 323, 336-38).  Cf. Lauer, 245 F.3d at 706 (holding that the ALJ impermissibly substituted his own opinion where no medical evidence supported the ALJ's RFC determination).  While a more restrictive RFC may have been supported by the record, the ALJ's RFC determination is supported by substantial evidence and therefore must be affirmed.  See generally Lacroix, 465 F.3d at 888-89.

**E.  Medical Evidence Submitted Directly to the Appeals Council**

Plaintiff argues that the Appeals Council failed to consider records which plaintiff submitted following the ALJ's adverse decision.  The Appeals Council must consider additional evidence that is new, material, and relates to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970(b).  "New" evidence cannot be cumulative of other evidence in the record.  Lamp v. Astrue, 531 F.3d 629, 932 (8th Cir. 2008).  "Material" evidence is evidence that is "relevant to the claimant's condition for the time period for which benefits were denied." Id. (citation omitted).

On March 23, 2010, Dr. Penilla made a statement that plaintiff was NHYA Class IV, indicating that plaintiff had cardiac disease resulting in an ability to carry on any physical activity without discomfort, had cardiac insufficiency or anginal syndrome even at rest, and had discomfort from any physical activity. (Tr. 346.) Plaintiff argues that Dr. Penilla's statement rebuts the regional medical consultant's May 1,

- 17 -

2009 finding that no evidence supported a finding of NYHA Class IV.  (Tr. 324-28.)

The  record  indicates  that  the  Appeals  Council  considered  Dr. Penilla's  March  23,  2010  statement,  but  that  this  statement  was insufficient to overturn the ALJ's decision.[4]  In the Notice of Appeals Council Action letter, the Appeals Council explained that it "considered the reasons [plaintiff] disagree[d] with the [ALJ's] decision and the additional evidence listed on the enclosed Order of Appeals Council" that the Appeals Council "found that this information does not provide a basis for changing the [ALJ's] decision."  (Tr. 41-42.)  Among the records listed on the attached Appeals Council Exhibits List and on the Order of Appeals  Council  was  Dr. Penilla's  March  23,  2010  NYHA  classification form.  (Tr.  45-46.)  Therefore,  the  record  indicates  that  the  Appeals Council considered Dr. Penilla's March 23, 2010 statement.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

  /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 28, 2011.

---

[4]Plaintiff argues that the Appeals Council failed to consider Dr. Penilla's August 22, 2010 statement that plaintiff is NYHA Class IV. Plaintiff cites to Tr. 346.  While Tr. 346 is a statement from Dr. Penilla that plaintiff is NYHA Class IV, this statement is dated March 23, 2010, as indicated on the time and date stamped at the top of the page.  As discussed above, the record indicates that the Appeals Council considered this March 23, 2010 statement from Dr. Penilla.  (Tr. 41-46.)